UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SCOTT COSTA,<br><br>          Petitioner,<br><br>   v.<br><br>M. PARR,<br><br>          Respondent. | Case No. 1:19-cv-00318-LJO-JDP (HC)<br><br>FINDINGS AND RECOMMENDATIONS THAT THE COURT DENY PETITION FOR WRIT OF HABEAS CORPUS AND INTERIM RELIEF WITHOUT PREJUDICE<br><br>ECF No. 1<br><br>OBJECTIONS DUE IN 14 DAYS |

Petitioner Michael Scott Costa, a federal prisoner represented by the Federal Public Defender, seeks a writ of habeas corpus under 28 U.S.C. § 2241. Petitioner seeks recalculation of his release date under the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (Dec. 21, 2018). Petitioner contends that Section 102(b) of the Act entitles him to 54 days of good time credit—also known as "good conduct time credit" or, more simply, "good time"—for each year of his sentence. Petitioner cannot prevail because Section 102(b) of the Act has not yet become effective.

**I.    Background**

A federal inmate can hasten his release from prison by obtaining good time through "exemplary compliance with institutional disciplinary regulations." *See* 18 U.S.C. § 3624(a)-(b). The method of calculating an inmate's good time has been litigated in the past, *see generally Barber v. Thomas*, 560 U.S. 474 (2010), and it is now settled that, in practice, a prisoner can

1

receive up to 47 days of good time for each year of the sentence imposed. The First Step Act introduces various amendments to the United States Code, including to the statutory provisions governing how the Federal Bureau of Prisons ("BOP") calculates inmates' good time. Under Section 102(b)(1)(A) of the First Step Act, inmates can earn up to 54 days good time for each year of the sentence imposed. *See* Pub. L. No. 115-391, § 102(b)(1)(A), 132 Stat. at 5213.

Petitioner has almost finished serving his sentence. In November 2008, the U.S. District Court for the Northern District of California sentenced petitioner to a 204-month term of imprisonment for conspiracy to distribute marijuana, conspiracy to commit money laundering, and other, related offenses. In January 2019, the sentencing court granted a motion to reduce petitioner's sentence to 180 months (fifteen years). Petitioner is scheduled to be released on April 7, 2020. He is also scheduled to be transferred to a halfway house on October 1, 2019, and to be placed on home confinement on October 7, 2019. *See* ECF No. 13 at 1.

## II. Discussion

A federal district court may grant habeas relief to a federal prisoner if his custody violates federal law. *See* 28 U.S.C. § 2241. While a federal prisoner challenging the validity of a conviction must bring a petition under Section 2255, a petitioner challenging the manner, location, or execution of that sentence must ordinarily rely on a petition under Section 2241. *See Hernandez v. Campbell*, 204 F.3d 861, 864 (9th Cir. 2000). The BOP, rather than the sentencing court, calculates a federal prisoner's entitlement to sentencing credit in the first instance. *See United States v. Wilson*, 503 U.S. 329, 335 (1992). The BOP's calculation of sentencing credit is a sentence's execution that a habeas petitioner may challenge with a Section 2241 petition. *See Zavala v. Ives*, 785 F.3d 367, 370 n.3 (9th Cir. 2015); *United States v. Giddings*, 740 F.2d 770, 772 (9th Cir. 1984). A federal prisoner must file a Section 2241 petition in the district of his custodian, not the district that sentenced him. *See Hernandez*, 204 F.3d at 865.

Here, petitioner raises only one habeas claim: that under the First Step Act, the BOP must award him an additional 105 days of good time. Petitioner has calculated this additional claimed good time by multiplying seven—the additional days he believes he is owed per year—by fifteen—the years of his amended term of incarceration. According to petitioner, he should

2

already be at a halfway house or transferred to home confinement.

**a. Ripeness**

We begin by considering our jurisdiction. Respondent argues that petitioner's claim is not ripe because Section 102(b) of the First Step Act has not become effective. ECF No. 11 at 2-3. The argument conflates the merits of the case with ripeness.

The Constitution limits federal courts' jurisdiction to deciding "cases" and "controversies." U.S. Const. art. III, § 2. Ripeness, one component of the case or controversy requirement, is a "question of timing, designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Clark v. City of Seattle*, 899 F.3d 802, 808 (9th Cir. 2018) (internal citation and quotation marks omitted). "The ripeness inquiry contains both a constitutional and a prudential component." *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 835 (9th Cir. 2012) (quoting *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993)). The constitutional component of the ripeness inquiry overlaps with the injury-in-fact analysis, as it requires issues that are "definite and concrete, not hypothetical or abstract." *Id.*; *accord Clark*, 899 F.3d at 809.

The prudential component of ripeness is "discretionary." *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1154 (9th Cir. 2017). The court will consider the "fitness of the issues for judicial review" and the "hardship to the parties of withholding court consideration." *Oklevueha Native Am. Church of Hawaii*, 676 F.3d at 837; *accord Bishop Paiute Tribe*, 863 F.3d at 1154. A claim is "fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010) (quoting *US W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999)). To show hardship, a party "must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss." *Id.*

Here, petitioner has shown both constitutional and prudential ripeness. Unnecessary incarceration presents a definite and concrete injury. Petitioner's claim is fit for this court's decision, since it does not require further factual development and the challenged actions here— the BOP's calculation of petitioner's good time credit and release date—are final. Declining to

3

decide the petition could result in hardship for petitioner in the form of prison time. Indeed, in a case pending before the Ninth Circuit, the federal government has acknowledged that the issue in this case—whether Section 102(b) of the First Step Act has become effective—is ripe for adjudication. *See Bottinelli v. Brown*, No. 19-35201, ECF No. 26 at 6-7 (9th Cir. filed June 5, 2019); ECF No. 13-2 at 7-8.

### b. Exhaustion

Ordinarily, a party's failure to exhaust available remedies is an affirmative defense. *See Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 832 (9th Cir. 2008). Petitioner has no obligation to raise the exhaustion issue before any response from the government, but he has chosen to do so. He contends that he need not exhaust administrative remedies because doing so would be futile. *See* ECF No. 6 at 13-14; *Ward v. Chavez*, 678 F.3d 1042, 1045 (9th Cir. 2012) (reasoning that exhaustion requirement may be excused in Section 2241 cases when exhaustion of administrative remedies would be "futile"). According to petitioner, the BOP has already informed certain federal prisoners that in the BOP's view the pertinent statutory amendment has not become effective, making pursuit of administrative remedies futile.

Respondent contends in his answer that the court should dismiss the petition because petitioner has not exhausted his administrative remedies. Respondent argues:

> The BOP has established an administrative remedy procedure through which an inmate can seek formal review of any complaint regarding any aspect of imprisonment. To bring a 28 U.S.C. § 2241 petition, a prisoner is ordinarily required to exhaust his administrative remedies. "It is only when a prisoner has exhausted his administrative remedies that he becomes entitled to litigate the matter in district court." *Chua Han Mow v. United States*, 730 F. 2d 1308, 1313 (9th Cir. 1984), *cert. denied*, 470 U.S. 1031 (1985). The record in this matter reflects Petitioner has not exhausted his administrative remedies. *See* Vickers Declaration. Additionally, even if granted the relief Petitioner has requested, he asserts his release date would be December 24, 2019. Supp. Pet. at 2. Petitioner would have had nearly 9 months to utilize the remedy process, and as such, exhaustion should not be excused in this case.

ECF No. 11 at 10. Respondent's argument fails to address petitioner's argument that any attempt to exhaust would be futile because the BOP has already informed federal prisoners how it interprets Section 102(b). We decline to dismiss the petition based on petitioner's alleged failure

4

to exhaust administrative remedies.

### c. Effective Date

We now turn to the central issue of this case: whether the amendments introduced by Section 102(b)(1)(A) of the First Step Act have become effective. Section 102(b)(1)(A) amends Section 3624(b)(1) of Title 18 of the United States Code, which allows a federal prisoner to earn up to 47 days of good time each year. The Section 102(b)(1)(A) amendments increase the maximum annual good time to 54 days.

Several courts have concluded that the amendments have not become effective, relying on the statutory text of Section 102(b)(2), a provision that follows Section 102(b)(1)(A), which states:

> (2) EFFECTIVE DATE.—The amendments made by *this subsection* shall take effect beginning on the date that the Attorney General completes and releases the risk and needs assessment system under subchapter D of chapter 229 of title 18, United States Code, as added by section 101(a) of this Act.

Pub. L. No. 115-391, § 102(b)(2), 132 Stat. at 5213 (emphasis added). The parties agree that the Attorney General has not completed and released the assessment system referenced in Section 102(b)(2). Petitioner contends that the phrase "this subsection" refers to Section 102(b)(1)(B), not the entire Section 102(b) or Section 102(b)(1)(A) in particular. According to petitioner, because the delayed effective date set out in Section 102(b)(2) does not apply to the Section 102(b)(1)(A)'s amendments on the good-time-credit calculation, the amendments became effective when the First Step Act was enacted on December 21, 2018. The case turns on the meaning of "this subsection" as the phrase appears in Section 102(b)(2).

### i. Statutory Text

Statutory interpretation "begins with the plain language of the statute." *Rojas v. Fed. Aviation Admin.*, 922 F.3d 907, 916 (9th Cir. 2019) (quoting *Eleri v. Sessions*, 852 F.3d 879, 882 (9th Cir. 2017)). "Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *J.B. v. United States*, 916 F.3d 1161, 1167 (9th Cir. 2019). "Only if this approach leaves or reveals ambiguity may we turn to extrinsic evidence such as legislative history." *Id*. In most cases, "[i]f we find the statutory language unambiguous, then we

5

will not resort to legislative history to guide our review"—absent exceptions such as the rule against absurdity. *See Chemehuevi Indian Tribe v. Newsom*, 919 F.3d 1148, 1151 (9th Cir. 2019). When statutory language is plain, the first canon of statutory construction is also the last, and "judicial inquiry is complete." *Hunsaker v. United States*, 902 F.3d 963, 968 (9th Cir. 2018) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)).

We first consider whether the statutory text is plain in meaning or ambiguous. *United States v. Kollman*, 774 F.3d 592, 596 (9th Cir. 2014). If a term is not defined in a statute, "we give the term its ordinary meaning." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140 (2018). We may not construe the statutory text in isolation; we consider the context. *See Lopez v. Sessions*, 901 F.3d 1071, 1077 (9th Cir. 2018). The context includes the statute's structure. *See Berezovsky v. Moniz*, 869 F.3d 923, 928 (9th Cir. 2017). We may also look to the surrounding text, *Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018), and similar provisions within the statute, *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013).

Here, the plain language of the statutory text indicates that the delayed effective date in Section 102(b)(2) applies to the entirety of Section 102(b); we see no ambiguity. Section 102(b) has three parts: First, Section 102(b)(1)—titled "In General"—amends the United States Code, specifically Sections 3624(b) and (g) of Title 18. Second, Section 102(b)(2)—titled "Effective Date" and the source of the statutory text at issue in this case—provides the effective date for "[t]he amendments made by this subsection." Third, Section 102(b)(3)—titled "Applicability"—explains how "[t]he amendments made by this subsection" should be applied. This is a common structure, and a straightforward reading shows that the three parts work together: the first part identifies what Section 102(b) does in general, the second part provides the effective date of Section 102(b), and the third part explains Section 102(b)'s application. We thus conclude that the phrase "this subsection" in Section 102(b)(2) means Section 102(b), including its three parts—Sections 102(b)(1) through (3)—and the language "[t]he amendments made by this subsection" refers to the amendments contained in Section 102(b)(1), including Sections 102(b)(1)(A) and (B).

The text of Section 102(b)(3)—the provision that immediately follows the disputed text in Section 102(b)(2)—further supports our conclusion. Section 102(b)(2) and Section 102(b)(3) use the identical language, "[t]he amendments made by this subsection":

> (2) EFFECTIVE DATE.—*The amendments made by this subsection* shall take effect beginning on the date that the Attorney General completes and releases the risk and needs assessment system under subchapter D of chapter 229 of title 18, United States Code, as added by section 101(a) of this Act.
>
> (3) APPLICABILITY.—*The amendments made by this subsection* shall apply with respect to offenses committed before, on, or after the date of enactment of this Act, except that such amendments shall not apply with respect to offenses committed before November 1, 1987.

Pub. L. No. 115-391, § 102(b)(2)-(3), 132 Stat. at 5213 (emphasis added).

Petitioner concedes that the language "[t]he amendments made by this subsection" in Section 102(b)(3) refers to both Sections 102(b)(1)(A) and (b)(1)(B), but contends that the language has a different meaning in Section 102(b)(2). He argues:

> However, as the Supreme Court reminded in *Barber*, the same phrase used in different parts of the same statute can mean different things, particularly where the phrase is one that speakers can easily use in different ways without risk of confusion. Here, "this subsection" could have a broader meaning in Section 102(b)(3) to include both the good-time fix and the new earned time system because that provision includes no reference to the risks and needs assessment system.
>
> Importantly, though, Congress would have had no need to include an express applicability provision for the clarifying good-time fix to apply to all inmates both prospectively and retroactively. As with Guidelines amendments, clarifications automatically apply retroactively. Just as an authoritative construction of a statute explains what the law has always meant, Congress's clarification of its intent says what the law has always meant. The fact that Congress expressly prohibited prisoners from receiving earned time credits for programs completed before the date of enactment, but omitted any such restriction for good time credits, confirms Congress's intent for the good-time fix to have both retroactive and prospective effect.

ECF No. 6 at 10-11 (citations and internal quotations omitted).

We disagree. In *Barber*, the Supreme Court interpreted the phrase "term of imprisonment," which could have different meanings in different contexts: (1) the sentence imposed by the judge and (2) the sentence actually served by the prisoner. 560 U.S. at 484. But

7

in this case, the language "[t]he amendments made by this subsection" appears in the same context in two adjacent provisions—which were passed simultaneously. It is unlikely that Congress would have used identical language to mean one thing in one provision and something else in the provision immediately following.

We find similarly unpersuasive petitioner's next argument—that "Congress would have had no need to include an express applicability provision for the clarifying good-time fix to apply to all inmates both prospectively and retroactively." Congress is free to state explicitly that its new law applies prospectively and retroactively, without assuming the reader's knowledge of the principle that legislation clarifying the intent of Congress ordinarily applies retroactively. Furthermore, we are not convinced that the principle identified by petitioner—that clarifying legislation applies retroactively—is so obvious that legislators would necessarily have assumed readers would apply it.[1]

Petitioner purports to raise another textual argument in support of his position that the delayed effective date in Section 102(b)(2) does not apply to Section 102(b)(1)(A). He argues:

> Moreover, the amendments in Section 102(b)(1)(B) repeatedly use the same phrase "this subsection" to mean subsection (g) of § 3624 that will govern earned-time transfer to prerelease custody. That phrase—"this subsection"—does not appear in the Section 102(b)(1)(A) good-time fix.

ECF No. 6 at 8. We believe petitioner is arguing that: (1) only the amendments in Section 102(b)(1)(B) use the phrase "this subsection," while the amendments in Section 102(b)(1)(A) do not use the same phrase; (2) the amendments in Section 102(b)(1)(B) use the phrase "this subsection" to mean Section 3624(g) of Title 18 of the United States Code; and (3) therefore, the phrase "this subsection" in Section 102(b)(2) must also refer to Section 3624(g) of Title 18 of the United States Code—*i.e.*, the amendments in Section 102(b)(1)(B).

Petitioner mistakenly relies on the usage of a phrase in different contexts: (1) the United States Code amended by the First Step Act Section 102(b)(1)(B)—*i.e.*, the "amendments in Section 102(b)(1)(B)," and (2) Section 102(b)(2) of the First Step Act. In the case of Section

---

[1] Petitioner contends elsewhere in his brief that the First Step Act, as legislation that clarifies the intent of Congress, is effective immediately. We address petitioner's argument below.

102(b)(1)(B), the phrase "this subsection" appears not in the framing language of Section 102(b)(1)(B) but rather in the new text to be added to the United States Code. Section 102(b)(1)(B) provides:

> (b) PRERELEASE CUSTODY.—
>
> > (1) IN GENERAL.—*Section 3624 of title 18, United States Code*, is amended . . .
> >
> > > (B) by adding at the end the following:
> > >
> > > > "(g) PRERELEASE CUSTODY OR SUPERVISED RELEASE FOR RISK AND NEEDS ASSESSMENT SYSTEM PARTICIPANTS.—
> > > >
> > > > "(1) ELIGIBLE PRISONERS.—*This subsection* applies in the case of a prisoner (as such term is defined in section 3635) who . . . has earned time credits under the risk and needs assessment system developed under subchapter D (referred to in *this subsection* as the 'System') in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment . . . ."
> > > >
> > > > "A prisoner placed in prerelease custody pursuant to *this subsection* who is placed at a residential reentry center shall be subject to such conditions as the Director of the Bureau of Prisons determines appropriate. . . ."
> > > >
> > > > "In determining appropriate conditions for prisoners placed in prerelease custody pursuant to *this subsection*, the Director of the Bureau of Prisons shall, to the extent practicable, provide that increasingly less restrictive conditions shall be imposed on prisoners who demonstrate continued compliance with the conditions of such prerelease custody, so as to most effectively prepare such prisoners for reentry."

Pub. L. No. 115-391, § 102(b)(1)(B), 132 Stat. at 5213 (emphasis added). These usages of "this subsection" indeed refer to Section 3624(g)—but this hardly suggests that the phrase "this subsection" as used in Section 102(b)(2) also refers to that same Section 3624(g). Congress can use the phrase "this subsection" to mean different things in different contexts.

In sum, the plain meaning of the statutory text provides that the delayed effective date in Section 102(b)(2) applies to the amendments introduced in Section 102(b)(1). Because the Attorney General has not completed or released the risk and needs assessment system, the

amendments to the good-time-credit calculation in Section 102(b)(1)(A) have not become effective. We need not go further, but we address petitioner's arguments that urge us to depart from the statutory text.

### ii. Absurdity or Unreasonable Result

Petitioner contends that applying Section 102(b)(2)'s delayed effective date to Section 102(b)(1)(A)'s amendments to the good-time-credit calculation results in an absurd or unreasonable result. He focuses on the differences between the good-time-credit and earned-time-credit regimes:

> There is an obvious need to delay implementation of the earned time transfer provision. The entirely new risk and needs assessment system must be in place before the BOP can begin using time credits earned under that system to determine which prisoners should be transferred to prerelease custody or supervised release.
>
> By contrast, the good time credit system is not new, and it operates on a separate plane from the earned time credit transfer and programming provisions of Title I. The BOP has been touting the need for this amendment for many years. The good time credit amendment is a simple calculation, subtracting seven days of good time credit for each year served from compliant prisoners' sentences. The BOP's SENTRY computer system could implement the adjustment virtually overnight. The time involved for individuals is relatively small and needs no programming to implement. Unlike larger sentence reductions such as those implemented by retroactive guideline amendments, prisoners impacted by the good-time fix would already be close to release and prepared for reentry. Delaying the good-time fix makes scant sense and undermines rather than furthers coherent implementation of the First Step Act.

ECF No. 1 at 8-9. We are not persuaded.

Courts have refused to construe statutes in ways that would lead to absurd or unreasonable results. *See United States v. Casasola*, 670 F.3d 1023, 1029 (9th Cir. 2012); *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1210 (9th Cir. 2009). No bright line rule tells us what constitutes an absurd or unreasonable result, but it remains uncontroversial that courts should find absurd or unreasonable results rarely, and only in extreme cases. *See Tovar v. Sessions*, 882 F.3d 895, 904 (9th Cir. 2018) (deporting an individual and requiring him to "wait decades longer for a visa just because his father naturalized"); *Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*, 729 F.3d 1025, 1036 (9th Cir. 2013) (requiring Secretary of Interior to "fund every

10

contract request, for any amount" presented by Native-American Tribe). Except for those rare cases, "Congress generally 'intend[s] the full consequences of what it says'—even if 'inconvenient, costly, and inefficient.'" *Thacker v. Tennessee Valley Auth.*, 139 S. Ct. 1435, 1441 (2019) (quoting *Fed. Hous. Admin., Region No. 4 v. Burr*, 309 U.S. 242, 249 (1940)). Harsh outcomes are not necessarily absurd or unreasonable. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004).

Petitioner raises at best a policy objection to Congressional action; he does not identify an unreasonable or absurd result. The government, for its part, offers two reasons why it believes its reading of Section 102(b)(2) makes sense: (1) immediate enforcement would be administratively difficult; and (2) the amendments in Section 102(b) are related and meant to work together. ECF No. 11 at 7. The government's stated reasons suffice to persuade us that enforcing the plain text of Section 102(b)(2) does not produce an absurd or unreasonable result.[2]

### iii. Corrective Legislation

Petitioner contends that the good-time-credit amendments apply immediately because they correct a past mistake. He argues that federal courts' current reading of Section 3624(b)(1)—that a federal prisoner can earn 47 days of good time credit per year—is a mistake that the First Step Act is intended to fix. Petitioner relies on *Gozlon-Peretz v. United States*, 498 U.S. 395 (1991), in support of his position that legislation that amends a prior mistake such as Section 102(b)(1)(A) applies immediately. He also relies on legislative history of the First Step Act.

We assume, without deciding, that *Gozlon-Peretz* applies here[3] and that considering the legislative history of the First Step Act is appropriate—but we still cannot adopt petitioner's

---

[2] We express no opinion whether the justifications offered by the government constitute good policy or whether they capture the actual Congressional motivation for Section 102(b)(2).

[3] We doubt that *Gozlon-Peretz* applies here. In *Gozlon-Peretz*, the Supreme Court interpreted a statutory provision that had not explicitly provided an effective date. 498 U.S. at 404. Indeed, before turning to the intent of Congress, the Supreme Court noted the absence of any explicit statutory text on effective date. *Id*. ("Turning first to the text of the statute, we note that § 1002, like many other congressional enactments, contains no provision for its effective date. Nor is there an effective date specified for the ADAA as a whole."). In contrast, the First Step Act explicitly provides an effective date for Section 102(b), as discussed above.

11

position.  The current method of calculating good time comes from the Sentencing Reform Act of 1984, so were we to consider any legislative history, we would first turn to the legislative history of the Sentencing Reform Act of 1984, not that of the First Step Act.  *See* 98 Stat. 1987, 18 U.S.C. § 3551 *et seq*., 28 U.S.C. §§ 991-998; *Barber*, 560 U.S. at 481.  The legislative history of the First Step Act is of limited use in interpreting the Sentencing Reform Act of 1984; reasonable jurists can disagree on the weight courts should give a statute's legislative history, but many would agree that the views expressed by the legislators *after* the enactment of a statute, without more, do not warrant controlling weight as evidence of Congressional intent in passing prior legislation.  *See O'Gilvie v. United States*, 519 U.S. 79, 90 (1996) ("[T]he view of a later Congress cannot control the interpretation of an earlier enacted statute."), and *United States v. X-Citement Video, Inc*., 513 U.S. 64, 77 (1994) ("[T]he views of one Congress as to the meaning of an Act passed by an earlier Congress are not ordinarily of great weight, and the views of the committee of one House of another Congress are of even less weight.").  Adding to the problem, the Supreme Court has already considered the legislative history of the Sentencing Reform Act of 1984 and rejected petitioner's view.  *See Barber*, 560 U.S. at 480 ("The statute's language and its purpose, taken together, convince us that the BOP's calculation method is lawful.").

We now turn to an ancillary matter raised by petitioner: his request for discovery on legislative materials.  Here is petitioner's request:

> If the government disputes the intent of the drafters with respect to the effective date of the good-time fix, Mr. Costa requests that the Court authorize discovery in support of his motion.  Specifically, the defendant requests that the government provide petitioner with *all writings* in the possession of the BOP and the Department of Justice related to the promulgation and implementation of the good time credit amendment from the initial decision to seek such a legislative measure to and including the adoption of the First Step Act's good time credit provision, including but not limited to memoranda, reports, implementation plans, evaluations, letters, and electronic communications.  In addition to the Court's authority by rule and inherent power to require such production, the discovery sought should also be considered required in potential mitigation of sentence under *Brady v. Maryland*, 373 U.S. 83 (1963).

ECF No. 6 at 15 (emphasis added).  Petitioner does not explain why he needs the materials he seeks when the pertinent legislative history is available to the public.  *See* Rule Governing

Section 2254 Cases, 6(b). In any event, petitioner's discovery request is too broad. The Federal Rules of Civil Procedure, which apply to habeas proceedings, prohibit discovery requests that are unduly broad or burdensome. *See* Rule Governing Section 2254 Cases, 6(a); Fed. R. Civ. P. 26(b)(1); *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998). Petitioner has not attempted to limit the scope of his discovery request, and we will deny it.

In sum, petitioner has not shown the First Step Act is intended to correct a mistake or that he needs additional materials to show the legislative intent of the First Step Act or the Sentencing Reform Act of 1984. Petitioner's request for discovery is denied.

### iv. Constitutional Concerns

Petitioner contends that the government's reading of Section 102(b)(2), which we adopt, raises constitutional concerns. He argues that the absence of a rational basis for discriminating between petitioner and the inmates who will earn good time credits after the delayed effective date "triggers equal protection concerns." ECF No. 6 at 12 (quoting *United States v. Juvenile Male*, 900 F.3d 1036, 1043 (9th Cir. 2018)). Even if the law required equal punishment among inmates,[4] we would still reject this argument.

The parties agree that the rational basis standard applies here. In a rational basis analysis, "the absence of legislative facts explaining the distinction on the record has no significance." *United States v. Navarro*, 800 F.3d 1104, 1114 (9th Cir. 2015). "Rather, rational-basis review allows for decisions based on rational speculation unsupported by evidence or empirical data." *Id*. In addition, "[t]he rational basis standard . . . does not require that the Commission choose the best means of advancing its goals." *Id.* "[A]ll that is needed is some 'rational connection' between the rule and the governmental interest, regardless of whether that rule is an 'exact fit' for the interest at issue." *Id*.

---

[4] It does not. *See Williams v. Illinois*, 399 U.S. 235, 243 (1970) ("The mere fact that an indigent in a particular case may be imprisoned for a longer time than a non-indigent convicted of the same offense does not, of course, give rise to a violation of the Equal Protection Clause. . . . The Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences.").

13

Here, the government has presented a rational justification for its policy: without the delayed effective date, the government would bear a significant administrative burden because in short order it would have to release or relocate many inmates. Even the legislative history materials that petitioner asks us to consider arguably support the government's position:

> Now, it is important to note that all of those, if this bill is passed, will participate in the rehabilitation programs, but it is also important to note that the Bureau of Prisons has closed halfway houses. That is a component of this bill. . . .
>
> Let me be very clear: The corrections officers indicate they don't have the staff. Halfway houses have been closed.
>
> Early release would be into a halfway house system which is so underfunded that there is no bed space. Therefore, it will be unlikely that prisoners can truly be released given the reality of the current halfway house system. . . .
>
> The Bureau of Prisons has cut contracts with halfway houses and terminated 6,000 correctional officers. This bill cannot achieve its goals without an adequately staffed prison system, as well as sufficient space at halfway houses.

115 Cong. Rec. H4314-15, 4319 (daily ed. May 22, 2018).[5] Although petitioner disputes whether the government's position is correct, this rationale satisfies the rational basis standard. *See Navarro*, 800 F.3d at 1114. Petitioner has not shown that enforcing Section 102(b)(2) as written raises constitutional concerns.

### d. Interim Relief

Petitioner asks for interim relief in the form of conditional release to a halfway house or transfer to home confinement. ECF No. 6 at 13. Indeed, if petitioner were improperly imprisoned, he would face irreparable harm: unjustified incarceration in prison. Nonetheless, we cannot grant interim relief here.

The Ninth Circuit has not yet decided whether district courts have the authority to grant interim relief such as bail pending resolution of a habeas petition. *See United States v. McCandless*, 841 F.3d 819, 822 (9th Cir. 2016) (per curiam). "If district courts have that authority, we have indicated that it is reserved for 'extraordinary cases involving special

---

[5] *Available at* https://www.congress.gov/115/crec/2018/05/22/CREC-2018-05-22-pt1-PgH4302-2.pdf (last visited June 5, 2019).

14

circumstances or a high probability of success.'" *United States v. McCandless*, 841 F.3d 819, 822 (9th Cir. 2016) (citing *In re Roe*, 257 F.3d 1077, 1080 (9th Cir. 2001) and *Land v. Deeds*, 878 F.2d 318, 318 (9th Cir. 1989)). To show the requisite probability of success, the petitioner seeking interim relief must show that there is a "high probability" that a higher court will rule in his favor. *See United States v. McCandless*, 841 F.3d 819, 822 (9th Cir. 2016). Special circumstances that warrant interim relief cannot be "speculative." *Id*.

      Here, we cannot say that petitioner has a high probability of success. Every court that we know to have addressed the issue has reached the same conclusion we reach in this case. Although petitioner attempts to distinguish several of those cases, he does so without success.[6] It also appears to us that all judges in this district who have considered the issue have reached the same conclusion as we have.[7] Petitioner cites two cases that allegedly support his position, but

---

[6] *See Christopher v. Wilson*, No. 4:19-cv-214, 2019 WL 1745968, at *1 (N.D. Tex. Apr. 18, 2019) ("[T]he good-time-credit change will not take effect until the attorney general completes the risk and needs assessment system required to be completed within 210 days after the December 21, 2018 enactment, as provided by §§ 101(a) and 102(b)(2) of the FSA 2018.") (citations omitted); *United States v. Landry*, No. 3:18-cr-5002, ECF No. 53 at 3 (W.D. Wash. April 3, 2019) ("[T]he effective date of the amendment related to good conduct credit is deferred until after Bureau of Prisons creates and releases its risk assessment program, as required by Section 101(a) of the First Step Act."); *Roy v. Bureau of Prisons*, No. 2:19-cv-59, 2019 WL 1441622, at *1 (E.D. Wash. Apr. 1, 2019) ("[T]he change will not take effect until the Attorney General completes the risk and needs assessment system required to be completed by 210 days after the Act's enactment.") (citations omitted); *Bottinelli v. Salazar*, Case No. 3:19-cv-256, ECF No. 18 at 2 (D. Ore. Mar. 13, 2019) ("I find that the text of the First Step Act requires me to dismiss Petitioners' claims as meritless. . . . I cannot, as Petitioners invite me to do, ignore Section 102(b)(2)'s express and unambiguous text and conclude that, despite what it clearly said, Congress really intended the 'good time fix' to be effective immediately."); *Schmutzler v. Quintana*, No. 5:19-cv-46, 2019 WL 727794, at *2 (E.D. Ky. Feb. 20, 2019) ("[T]his provision has not yet taken effect: Section 102(b)(2) of the Act specifically provides that the amendments made in subsection 102(b) of the Act take effect only when the Attorney General completes the risk and needs assessment system required by Section 101(a) of the Act."); *Shah v. Hartman*, No. 1:18-cv-7990, ECF No. 12 at 3(N.D. Ill. Jan. 8, 2019) ("Section 102(b) of the First Step Act states that the amendment to section 3624(b) does not take effect until after the Attorney General completes and releases the needs assessment system established under section 101(a) of the Act.").

[7] *See United States v. Turnquist*, No. 1:12-cr-173, ECF No. 87 (E.D. Cal. Mar. 14, 2019) (Ishii, J.); *Kornfeld v. Puentes*, No. 1:19-cv-263, 2019 WL 1004578, at *3 (E.D. Cal. Mar. 1, 2019) (Thurston, J.); *Rizzolo v. Puentes*, No. 1:19-cv-290, 2019 WL 1229772, at *3 (E.D. Cal. Mar. 15,

the habeas petitions in those cases were unopposed because the government did not respond to the merits of the petitions—and thus the courts did not reach the merits. *See United States v. Dunshie*, No. 4:10-cr-14, ECF No. 177 (D. Alaska Apr. 1, 2019); *United States v. Mark Walker*, No. 3:10-cr-298, ECF No. 110 (D. Or. Feb. 7, 2019).[8]

Petitioner has not shown the required special circumstances either. This court has upheld the BOP's decision to deny a habeas petitioner's placement at a halfway house for budgetary concerns. *Gonzales v. Lake*, No. 1:18-cv-499, 2018 WL 6184606, at *4 (E.D. Cal. Nov. 27, 2018), *recommendation adopted by* 2018 WL 5850230, at *1 (E.D. Cal. Nov. 6, 2018). Given the administrative burden that the proposed house confinement or placement at a halfway house may entail and the BOP's discretion to decide the length of a petitioner's placement at a halfway house, we cannot say that the BOP can implement the interim relief proposed by petitioner.

In sum, the court must deny the petition because it does not present a cognizable claim. Section 102(b)(2) of the First Step Act plainly and explicitly indicates that the pertinent amendments have not become effective, so petitioner cannot prevail. As one court has explained:

> This Court is not unsympathetic to the apparent inequity of Petitioner's situation. This Court, however, is obligated to apply the law as it is written. Congress chose to delay the implementation of the First Step Act's amendments until the Attorney General could complete the risk and needs assessment. The Court has no power to rewrite or disregard the statute in order to accommodate Petitioner's situation.

---

2019) (Oberto, J.).

[8] Petitioner argues that this court should give lesser weight to several of the cases rejecting petitioner's position because they were litigated by *pro se* petitioners. This court does its best to provide fair consideration in all cases, including cases brought by *pro se* litigants, and we trust that other courts do the same. Petitioner's argument also rings hollow considering *Landry*—a case petitioner attempts to distinguish—in which the court rejected the arguments from a *pro se* petitioner, who appears to have copied and pasted from the same source materials used by petitioner in this case. *Compare* ECF No. 6 (petitioner's brief), *and Landry,* No. 3:18-cr-5002-RBL, ECF No. 48 (W.D. Wash. March 11, 2019) (pro se petitioner's brief raising identical arguments verbatim), *with* STEPHEN R. SADY AND ELIZABETH G. DAILY, DELAYED IMPLEMENTATION OF THE FIRST STEP ACT'S GOOD TIME CREDIT FIX VIOLATES THE RULES OF STATUTORY CONSTRUCTION AND DUE PROCESS OF LAW (Feb. 2019), *available at* http://or.fd.org/system/files/case_docs/Goodtimeblog_2019-02-13_final.pdf (last visited June 5, 2019) (original source).

*Shah v. Hartman*, No. 18-cv-7990, ECF No. 12 (N.D. Ill. Jan. 2019).

**III.   Findings and Recommendations**

We recommend that the court deny the petition for a writ of habeas corpus, ECF No. 1, and interim relief without prejudice.

These findings and recommendations are submitted to the U.S. District Court Judge presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 14 days of the service of the findings and recommendations, petitioner may file written objections to the findings and recommendations with the court and serve a copy on all parties.  That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The District Judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

IT IS SO ORDERED.

Dated:   June 13, 2019

UNITED STATES MAGISTRATE JUDGE

No. 202

17